Filed 9/29/15  P. v. Vicario CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RUDOLPH VALDEZ VICARIO,<br><br>        Defendant and Appellant. | E060921<br><br>(Super.Ct.Nos. FWV1303140 & FWV1303276)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

A jury convicted defendant Rudolph Valdez Vicario of one count of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1), count 2), and one count of possessing a slungshot[2] (§ 22210, count 3). In a bifurcated proceeding, defendant admitted to suffering six prior prison terms. (§ 667.5, subd. (b).) After relieving defendant's public defender and granting defendant's motion to represent himself (see *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)), the trial court denied defendant's new trial motion and sentenced him to the middle term of three years on count 2, deemed count 2 to be the principal count, and sentenced defendant to eight months (one-third the middle term of two years) for count 3, to be served consecutively with the sentence on count 2. The trial court also sentenced defendant to one year for each of defendant's six admitted prior prison terms, to be served consecutively with the sentence on count 2, for a total sentence of nine years eight months in state prison.

---

[1] Unless otherwise indicated, all additional statutory references are to the Penal Code.

[2] Not to be confused with a *sling*shot (*People v. Mulherin* (1934) 140 Cal.App. 212, 214), a slungshot falls within the category of crude weapons commonly known as "saps." (*Id*. at p. 215.)

On appeal, defendant contends: (1) the record does not contain substantial evidence to support his conviction on count 2 for assault with a deadly weapon; (2) the trial court committed prejudicial instructional error by instructing the jury that the definition of a "deadly weapon" includes an object, instrument, or weapon that is inherently dangerous; (3) the trial court erred by permitting him to waive his right to counsel and to represent himself, for purposes of making a new trial motion and for sentencing, without adequately inquiring whether defendant's *Faretta* request was unequivocal and by not adequately admonishing him of the disadvantages of self-representation; (4) the trial court erred by not staying the sentence on count 3 pursuant to section 654 or, in the alternative, by not imposing a concurrent sentence on count 3 instead of a consecutive sentence; and (5) because the record does not demonstrate the trial judge understood its discretion to strike some or all of the admitted prior prison term enhancements, the matter should be remanded for the judge to exercise that discretion.

We conclude the record contains substantial evidence that defendant committed an assault with a deadly weapon. Although we agree with defendant that the trial court's instruction on the definition of a "deadly weapon" erroneously informed the jury that an inherently dangerous weapon satisfies that definition, we hold the error was harmless beyond a reasonable doubt. With respect to defendant's *Faretta* claim, we conclude the trial court's inquiry into defendant's desire to represent himself and the court's admonitions about the pitfalls of self-representation were constitutionally adequate. Finally, we conclude the trial court properly imposed a sentence on count 3 to run consecutively to the sentence on count 2, and there is no need to remand the case for the

3

court to exercise discretion of whether to strike some or all of defendant's prior prison term enhancements. The trial court struck three of the nine prior prison term allegations in the first amended information and two out-on-bail enhancement allegations, so the court clearly understood its discretion to strike prison priors. Because we find no prejudicial error, we affirm the judgment in its entirety.

## II.

## FACTS AND PROCEDURAL BACKGROUND

In a first amended information, the People charged defendant with two counts of possessing an instrument or weapon commonly known as a billy, blackjack, sandbag, sap, or slungshot (§ 22210, counts 1 & 3), and one count of assault with a deadly weapon (§ 245, subd. (a)(1), count 2). The People alleged defendant committed counts 2 and 3 while released from custody on bail or on his own recognizance pending charges in a separate case within the meaning of section 12022.1, subdivision (b), and that defendant suffered nine prior prison terms within the meaning of section 667.5, subdivision (b).

Ernest Vicario, defendant's brother, testified that on September 28, 2013, he was in his bedroom when he heard a scuffle or a "big loud thump" coming from another room in the house. Ernest ran from his bedroom to the front of the house, where he saw his nephew Javier Guevara enter another room. As Ernest approached the room, he continued to hear the noise of a scuffle coming from inside and saw that someone closed the door. Ernest forced the door open, and he saw Javier and defendant fighting and grabbing each other in a bear hug. Ernest tried to separate the two by pushing defendant out of the room. When he did so, he saw a rope with a lock on one end and a loop on the

4

other end dangling from defendant's wrist. To avoid being hit, Ernest grabbed the lock and pulled the rope from defendant's wrist. Ernest testified that he did not see defendant hit anyone with the lock, but said, "it could [have] been used as something" and that he was afraid he might be hit by it. On cross-examination, Ernest testified that defendant is a tree trimmer by trade. Although Ernest had never seen defendant use an item such as the lock attached to the rope in his tree-trimming business, he had seen defendant use a weighted item to throw a rope over a tree branch.

Javier testified that on September 28, 2013, he was outside his grandmother's Chino home when he heard yelling inside the house. Javier testified that when he entered the house, he could not see who was arguing because the house was dark and his eyes were still adjusting to coming in from bright daylight, but that he heard defendant's voice. Javier told Ernest to grab the rope with the lock attached to it from defendant's wrist "[j]ust in case he was mad and wanted to do something" with it. Javier denied that he and defendant fought, but testified that he grabbed defendant in a bear hug. Javier testified he did not believe he or Ernest were in danger of being hit with the lock.

Javier testified he "kind of" remembered receiving a phone call from a police officer about the incident, but he could not remember telling the officer that defendant approached him in an angry manner, that defendant swung the rope at him, and that he moved just in time to avoid being struck. Javier testified he did remember telling the officer that defendant "was out of it," and that he told the officer he did not want defendant arrested or prosecuted. On cross-examination, Javier testified he and defendant work as tree trimmers, and that a weighted object attached to a rope may be

5

used to throw a longer rope around tree branches. On redirect, Javier testified his memory of what transpired would have been fresher the night of the incident when he spoke to the police officer on the phone.

Officer Miller of the Chino Police Department testified he is familiar with a slungshot from his training and experience, and that a slungshot is a manufactured weapon consisting of "a rope or a cord at one end attached or fastened to the wrist" with "a heavy, weighted dense object" on the other end. On September 28, 2013, Miller responded to a home in Chino. When he arrived, Miller found an object lying in the dirt that he opined was a slungshot. He described the object as a rope or cord with a knot tied on one end "for better grip and hard impact" and a padlock on the other end. When asked how the object would be used as a weapon, Miller testified it would be "[a]ttached to the wrist" and "swung around as a bludgeoning object." Miller also testified the object could potentially cause great bodily injury or death.

Miller testified he called Javier the night of the incident as part of his investigation. Javier was reluctant to provide details of the incident, and told Miller he did not desire prosecution. Miller testified he felt Javier was trying to minimize the incident by saying he was "out of it" and could not remember what happened. According to Miller, Javier said that when he went to the Chino residence, defendant and Ernest were there. Javier also said defendant approached him in an "aggressive" and "enraged manner," and that defendant swung an object at him. Javier told Miller that he moved away just in time to avoid being struck, but was unable to give Miller any further details

6

about the item defendant wielded. Javier told Miller he was "shaken up" and "frightful," and left the home to avoid further complications.

A jury found defendant not guilty of possessing a slungshot as alleged in count 1. (§ 22210.) The jury found defendant guilty of assault with a deadly weapon as alleged in count 2 (§ 245, subd. (a)(1)), and guilty of possessing a slungshot as alleged in count 3 (§ 22210).

In a separate proceeding, defendant admitted to suffering six prior prison terms. (§ 667.5, subd. (b).) After granting defendant's request under *Faretta* to represent himself and denying defendant's motion for new trial, the trial court sentenced defendant to the middle term of three years on count 2, deemed count 2 to be the principal count, and sentenced defendant to eight months (one-third the middle term of two years) for count 3, to be served consecutively to the sentence on count 2. The trial court also sentenced defendant to one year for each of defendant's six admitted prior prison terms, to be served consecutively with the sentence on count 2, for a total sentence of nine years eight months in state prison. On the People's motion, the trial court dismissed the two out-on-bail enhancement allegations (§ 12022.1, subd. (b)) and the three prior prison term allegations defendant did not admit.

Defendant timely appealed.

III.

DISCUSSION

A.      *Substantial Evidence Supports Defendant's Conviction for Assault with a Deadly Weapon*

Defendant contends his conviction for assault with a deadly weapon is not supported by solid and credible evidence because:  (1) the sole testimony that defendant swung a slungshot at Javier came from Officer Miller; (2) Javier denied telling Miller that defendant swung the slungshot at him; and (3) the conversation between Miller and Javier took place late at night after Javier was awoken by Miller's telephone call.  Based on the well-settled standard of review, we conclude a reasonable jury could have found defendant guilty beyond a reasonable doubt of assault with a deadly weapon.

"''"On appeal, '"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]  In conducting such a review, we '"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]"''" (*People v. Jackson* (2014) 58 Cal.4th 724,

749 (*Jackson*).) "The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

"Section 245, subdivision (a)(1), punishes assaults committed by the following means: 'with a deadly weapon or instrument other than a firearm,' or by 'any means of force likely to produce great bodily injury.' One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 (*Aguilar*).)

"As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue. [Citations.]" (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029.)

Officer Miller testified he was familiar with slungshots from his training and experience, and described them as manufactured weapons consisting of "a rope or a cord at one end attached or fastened to the wrist" with "a heavy, weighted dense object" on the other end. When Miller arrived at the Chino residence, he found an object lying in the dirt that he opined was a slungshot. He described the object as a rope or cord with a knot tied on one end "for better grip and hard impact" and a padlock on the other end. Miller testified such a weapon would be "[a]ttached to the wrist" and "swung around as a bludgeoning object," and that it could potentially cause great bodily injury or death.[3]

Miller also testified that he called Javier on the telephone and asked him what happened. Javier was reluctant to speak to Miller and at first said he could not remember what happened, but he nonetheless told Miller that defendant approached him in an

---

[3] On appeal, defendant does not challenge the sufficiency of the evidence for his conviction on count 3 for possessing a slungshot (§ 22210), and he does not claim that the weapon he swung at Javier did not meet the definition of a slungshot. The record amply supports the jury's verdict that the weapon defendant unlawfully possessed and wielded was a slungshot. (*People v. Fannin* (2001) 91 Cal.App.4th 1399, 1406 ["a slungshot is a striking weapon consisting of a heavy weight attached to a flexible handle"]; *People v. Williams* (1929) 100 Cal.App. 149, 151 [adopting dictionary definition of "a slungshot as a small mass of metal or stone fixed on a flexible handle, strap or the like, used as a weapon"].)

aggressive way; that defendant swung the slungshot at him; and that he moved away just in time to avoid being hit. Javier also told Miller that he left the house feeling "shaken up" and "frightful."[4]

Defendant's substantial evidence challenge essentially asks this court to replace our view of the record for that of the jury, something we may not do. That no other witness testified defendant swung a slungshot at Javier is of no moment because, unless physically impossible, the testimony of one credible witness may constitute substantial evidence. (Evid. Code, § 411; *People v. Elliot* (2012) 53 Cal.4th 535, 585.) Moreover, contrary to the suggestion in defendant's opening brief, Javier did not "den[y] ever telling Miller" that defendant swung the slungshot at him. Rather, when asked on direct examination whether he *remembered* telling Miller that defendant swung the slungshot at him, Javier responded, "No, I don't." Likewise, when asked if he *remembered* telling Miller that he moved away just in time to avoid being hit with the slungshot, Javier answered, "Like I said, I do not remember." Finally, that Javier may have been half asleep and "out of it" when he spoke to Miller were factors for the jury to consider when deciding whether Miller's or Javier's testimony was more credible. To the extent

---

[4] In his briefs, defendant points to the fact that Miller's testimony about the assault was hearsay. Defendant interposed a hearsay objection, which the trial court overruled, when Miller testified that Javier said he did not want defendant prosecuted. Defendant does not challenge that evidentiary ruling on appeal, and he interposed no additional hearsay objections to Miller's testimony about his phone conversation with Javier. On appeal, relevant evidence that might otherwise have been excluded as hearsay, had a timely objection been made, is properly considered as supporting the judgment. (*People v. Sangani* (1994) 22 Cal.App.4th 1120, 1142; Cal. Law Revision Com. com., 29B pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 140, p. 27.)

11

Miller's and Javier's testimony was in conflict, it was the jury's job to resolve the conflict and we may not second-guess the jury's resolution. (*Jackson*, *supra*, 58 Cal.4th at p. 749.)

Based on the foregoing, we conclude defendant's conviction for assault with a deadly weapon is supported by substantial evidence.

B.  *Defendant Was Not Prejudiced by the Trial Court's Erroneous Instruction on Assault with a Deadly Weapon*

Defendant argues the trial court erred by instructing the jury with an outdated version of CALCRIM No. 875 that defined "deadly weapon," for purposes of assault with a deadly weapon in violation of section 245, subdivision (a)(1), to include weapons or objects that are inherently dangerous. The People appear[5] to concede the error, but contend any error was harmless. We conclude the instruction was erroneous but that the error was harmless beyond a reasonable doubt.

1.  <u>Additional Background</u>.

The trial court instructed defendant's jury with CALCRIM No. 875 for the elements of assault with a deadly weapon. As relevant here, that instruction defined a "deadly weapon" as "any object, instrument or weapon that is inherently deadly or

---

[5]  The People hedge their concession, arguing the jury did not convict defendant "on the *arguably* inadequate theory" that the slungshot was an inherently dangerous weapon. (Italics added.)

12

dangerous, or one that is used in such a way that is capable of causing or likely to cause death or great bodily injury."**6**

During closing argument, the prosecutor described the incident as "a dangerous situation" "involving an angry man who is armed with a weapon." When discussing the charge of assault with a deadly weapon, the prosecutor told the jury that the first element it had to find true beyond a reasonable doubt was that defendant "did an act with a deadly weapon that, by its nature, would directly and probably result in the application of force." The prosecutor argued this element was proven because "[w]e know he swung the slungshot at Javier."

Although the prosecutor did not directly address the definition of a deadly weapon, she told the jury the evidence established that a reasonable person would believe defendant's act of swinging the slungshot would directly and probably result in the application of force because Ernest testified he took the slungshot from the defendant because he did not want defendant to hit him or Javier. The prosecutor then told the jury, "You are all reasonable people. No one wants to get hit by a Master lock attached to a rope that has a thumb thing to hold properly. When it is swung around, this can cause a lot of pain. It can cause a lot of damage. And if it's in the right spot, it could kill you."

---

**6** As the People point out in their brief, defendant did not object to the court instructing the jury with CALCRIM No. 875 or object that the instruction as given was erroneous. Even in the absence of an objection, we may review a claim of instructional error that allegedly affects the defendant's substantial rights. (§ 1259; *People v. Brown* (2012) 210 Cal.App.4th 1, 9, fn. 5 (*Brown*).)

13

Defendant's attorney did not address the definition of a "deadly weapon" during her closing argument either. Instead, she argued to the jury that defendant used the rope with the lock attached to it in his tree-trimming business; that the object was not a slungshot; and that Ernest and Javier were not very concerned about being hit with the object.

Finally, during rebuttal, the prosecutor again told the jury "[t]his is a dangerous situation involving a man who gets angry and uses manufactured weapons." She also argued that defense counsel's suggestion that defendant merely possessed the object as part of his tree-trimming business was comical, and that no reasonable person could conclude defendant possessed the object inside the home "for any legitimate purpose."

2.     Analysis.

In *Brown*, *supra*, 210 Cal.App.4th 1, the trial court instructed the jury with CALCRIM No. 875 on the elements of assault with a deadly weapon. (*Id*. at 6.) As here, the instruction given in *Brown* defined a "deadly weapon" as "'any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.'" (*Id*. at p. 8.) On appeal, the defendant argued that, under *Aguilar*, *supra*, 16 Cal.4th 1023, the only viable theories for assault with a deadly weapon are use of an inherently deadly weapon or use of a weapon or object in a manner capable and likely to cause great bodily injury. (*Brown*, at p. 9.) Because the instruction read to the jury allowed for guilt if the jury concluded the weapon he used (a BB gun) was inherently *dangerous*, the defendant argued it was erroneous. (*Ibid*.) The Court of Appeal agreed.

14

The People in *Brown* relied on *Aguilar* for the proposition that "CALCRIM No. 875 accurately states the definition of 'deadly weapon' set forth in *Aguilar*, where the Supreme Court stated, 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' (*Aguilar*, *supra*, 16 Cal.4th at p. 1029.)" (*Brown*, *supra*, 210 Cal.App.4th at p. 9, fn. omitted.)

The *Brown* court rejected the People's reading of *Aguilar*. "The issue before the court in *Aguilar* was whether hands and feet could constitute deadly weapons under section 245, subdivision (a)(1). Citing *People v. Graham* (1969) 71 Cal.2d 303 (*Graham*), the *Aguilar* court began its discussion by observing, as the court had in *Graham*, that there are two categories of deadly weapons: objects or instruments that by their intrinsic nature are deadly and those that are not necessarily or inevitably deadly, but can be deadly for purposes of section 245 if used in a particular manner. (*Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029.) The *Graham* court made this observation in the context of former section 211a, where it addressed whether sufficient evidence existed to support a finding the defendant was guilty of perpetrating a robbery while armed with a 'dangerous or deadly weapon.' [Citation.] Addressing a statute that expressly included 'dangerous or deadly weapon' within its provisions, the *Graham* court identified two categories of 'dangerous or deadly' weapons: Those weapons that, because of their intrinsic nature, were 'dangerous or deadly' such as dirks and blackjacks, and those that were not per se deadly or dangerous but were used in a manner capable of inflicting and

15

likely to inflict death or great bodily injury.  (*Graham*, at pp. 327-328.)"  (*Brown*, *supra*, 210 Cal.App.4th at pp. 9-10, fn. omitted.)

"In citing *Graham* for the proposition that deadly weapons fall into those distinctive categories, the *Aguilar* court did not consider, much less determine, that inherently dangerous weapons are either synonymous with, or are to be included as, deadly weapons under section 245 regardless of the manner in which they are used. [Citation.]  Nor, when the emphasized language is read in context, is the People's interpretation of *Aguilar* a fair reading of the opinion, particularly in light of other sections of the decision that omit the phrase 'inherently dangerous weapon' entirely from the governing definition.  (See *Aguilar*, *supra,* 16 Cal.4th at p. 1033 ['a "deadly" weapon is one that is used in such a manner as to be capable of producing death or great bodily injury' (italics omitted)].)  Rather, the court's invocation of the language in *Graham* appears to be simply a reiteration of *Graham*'s dual categories of deadly weapons, those that are intrinsically deadly and those that are used in a deadly manner."  (*Brown*, *supra*, 210 Cal.App.4th at p. 10, fn. omitted.)

Next, the People argued that, in the context of a charge of assault with a deadly weapon in violation of section 245, subdivision (a)(1), there is no meaningful difference between an inherently deadly weapon and an inherently dangerous one.  (*Brown*, *supra*, 210 Cal.App.4th at p. 11.)  The court agreed that in some instances, the difference is meaningless.  "Almost any weapon or instrument that can properly be described as inherently dangerous will also be inherently deadly; likewise, an item that is not inherently deadly will often not be inherently dangerous."  (*Ibid*.)  However, the court

16

stated that "in a narrow category of cases, such as one involving, perhaps, a paintball marker or a slingshot, the distinction could be critical." (*Ibid*.)

As an example of a case where the distinction between inherently deadly and inherently dangerous weapons mattered, the *Brown* court cited *In re Bartholomew D*. (2005) 131 Cal.App.4th 317, in which the appellate court upheld an enhancement under section 12022, subdivision (b), for personal use of a "'deadly or dangerous weapon in the commission of a felony.'" (*Bartholomew D*., at p. 322.) "In upholding the juvenile court's finding the BB gun constituted a 'deadly or dangerous' weapon, the *Bartholomew D*. court explained the relevant statute uses the words 'dangerous or deadly' disjunctively. Accordingly, the court disregarded Bartholomew's argument there was insufficient evidence to find the BB gun a deadly weapon, emphasizing that, under section 12022, subdivision (b), ""'it is not necessary to show that the weapon is deadly so long as it can be shown that it is dangerous.'"" (*Id*. at p. 322.) The court went on to conclude substantial evidence supported the finding that the BB gun was dangerous, even if not deadly, without considering the manner in which it was used." (*Brown*, *supra*, 210 Cal.App.4th at p. 11.)

Therefore, the *Brown* court held "CALCRIM No. 875 may impermissibly allow a jury to convict a defendant of assault with a deadly weapon if it finds the weapon employed was inherently dangerous, even if it rejects the notion that the instrument was inherently deadly or used in a manner capable of causing and likely to cause death or great bodily injury." (*Brown*, *supra*, 210 Cal.App.4th at p. 11.) The court concluded by noting, "[t]hat possibility, however theoretical it may be in most cases, should be

17

obviated by an appropriate modification of the language in CALCRIM No. 875" and similar deadly weapon instructions. (*Id*. at p. 11 & fn. 10.)

The Judicial Council promptly responded to *Brown* by amending CALCRIM No. 875. Effective February 26, 2013, the definition of "deadly weapon" no longer includes an inherently "dangerous" weapon and the use notes now cite *Brown* as authority for the proper definition. (Judicial Council of Cal., Crim. Jury Instns. (2013 ed.) CALCRIM No. 875, pp. 598-601.) Although defendant's trial took place in December 2013—almost 10 months after the amendment to CALCRIM No. 875 went into effect—inexplicably the trial court instructed the jury with the February 2012, pre-*Brown* version of CALCRIM No. 875.[7]

There is no dispute that the version of CALCRIM No. 875 read to defendant's jury included the erroneous definition of "deadly weapon" disapproved by *Brown* and subsequently removed from the instruction. Nonetheless, the People contend the error was harmless beyond a reasonable doubt because the People's evidence and theory of the case was not based on the inherently dangerous nature of the weapon defendant wielded, so the jury did not find defendant guilty on that erroneous ground. We agree.

---

[7] Trial courts are strongly encouraged to use the "latest edition" of an official jury instruction. (Cal. Rules of Court, rule 2.1050(e).) Therefore, before giving an official instruction to the jury, it behooves the parties and the trial court to ensure it is the latest version adopted by the Judicial Council. (See 2 Cal. Trial Practice: Civil Procedure During Trial (Cont.Ed.Bar 2015) Jury Instructions, § 20.2, pp. 20-4 to 20-5 [advising litigants to "[m]ake sure to check for recent revisions" of official and pattern jury instructions].)

In *Brown*, the appellate court rejected the defendant's argument that the instructional error warranted reversal "because there [was] no basis to determine whether the jury relied on a legally incorrect theory to find him guilty of assault with a deadly weapon . . . ." (*Brown*, *supra*, 210 Cal.App.4th at pp. 11-12.) "Although the general rule in cases involving a legally inadequate theory 'has been to reverse the conviction because the appellate court is "'unable to determine which of the prosecution's theories served as the basis for the jury's verdict'"' [citation], even this type of error can, in an appropriate case, be harmless: 'If other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the findings necessary [with respect to the element of the crime at issue], the erroneous . . . instruction [on that element] was harmless.' [Citations.] '"To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record."' [Citation.]" (*Id*. at pp. 12-13.) Because the evidence and arguments of counsel left no reasonable doubt that the jury found the defendant in *Brown* guilty based on theory that he used a BB gun in a manner capable of inflicting and likely to inflict great bodily harm, and not based on the theory that the BB gun was an inherently dangerous weapon, the court found the error was harmless beyond a reasonable doubt. (*Id*. at pp. 13-14.)

So too here. Officer Miller testified that the object he recovered in this case is a slungshot, which he described as a weighted object attached to a rope or chord that is used to bludgeon. Miller testified the slungshot in this case could cause great bodily

injury or death. He did not opine that a slungshot is an inherently deadly or inherently dangerous weapon.[8]

During closing argument, the prosecutor did not argue slungshots in general, or the item defendant wielded in this case in particular, are inherently dangerous weapons. Nor, for that matter, did the prosecutor argue a slungshot or the item that defendant possessed are inherently deadly. Although she twice described the *situation* as dangerous, she was referring to the fact that defendant was angry and armed, and not to the weapon itself. When discussing the object, the prosecutor argued it met the definition of a slungshot and was not something defendant would legitimately use in his tree-trimming business. Moreover, the prosecutor told the jury a reasonable person would conclude the object wielded by defendant would directly and probably result in the application of force. "No one wants to get hit by a Master lock attached to a rope that has a thumb thing to hold properly. When it is swung around, that can cause a lot of pain. It can cause a lot of damage. And if it's in the right spot, it could kill you." Like the prosecutor, defense counsel did not address the definition of a deadly weapon, and she did not argue that the object defendant possessed was *not* an inherently deadly or dangerous weapon. In short, the concept of an inherently dangerous weapon was never discussed.

---

[8] Miller and another officer testified about an object recovered from the same Chino residence on an earlier date. Although that testimony related to count 1, on which the jury returned a not guilty verdict, we note that in the context of count 1, neither officer described slungshots in general, or the item recovered in the earlier incident in particular, as inherently dangerous weapons.

Based on the foregoing, we conclude there is no reasonable doubt that the jury concluded the slungshot defendant wielded in this case was used in a manner capable of inflicting and likely to inflict great bodily injury, and that the jury did not base its verdict on the inadequate theory that the slungshot, regardless of how defendant used it, was inherently dangerous. Therefore, we conclude the instructional error was harmless.

C. *The Trial Court Adequately Inquired into Defendant's Unequivocal Desire to Be Relieved of Appointed Counsel and Adequately Advised Defendant of the Consequences and Pitfalls of Representing Himself*

Defendant contends the trial court erred by granting his *Faretta* motion without first conducting a hearing under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to determine whether he unequivocally wished to waive his right to counsel, and without adequately advising him of the pitfalls of self-representation. We conclude otherwise.

1. Additional Background.

Before sentencing, defendant filed a form with the trial court indicating he wished to waive his right to appointed counsel and to represent himself for the remainder of the proceedings. At the hearing on defendant's request, the trial judge began by informing defendant "that it is almost always unwise to represent yourself and, in so doing, you might actually conduct a defense which may aid the prosecutor with regard to these charges." When the judge asked defendant, "Do you understand that?," defendant answered, "Yes." The trial judge noted the request was somewhat unusual because the jury had already rendered its verdicts and defendant was seeking to represent himself when making a new trial motion and at sentencing, and the judge asked defendant if he

21

was prepared to proceed. Defendant told the judge he was "a layman at law or ignorant at law," but that he "could learn to do this." Defendant then told the judge he tried telling his appointed attorney that Javier was not the victim in the case and that the incident involved him trying to protect his mother's house from a transient named Ralph, but that it "went right over [his attorney's] head."

The prosecutor interrupted defendant, telling the trial judge, "This is getting dangerously into *Marsden* and attorney/client privilege information." The judge then told defendant that, if he wanted to discuss attorney-client information, the judge would "clear the courtroom and we can go into those areas." However, the judge told defendant, "right now I'm interested in whether or not you want to represent yourself and whether you are prepared to represent yourself without talking about your attorney." Defendant responded he did want to represent himself, but that he also wanted "to hold a *Marsden* hearing so I can explain this to you. I have a motion and accusation that I want to talk to you about." The judge explained to defendant that a *Marsden* hearing is conducted when a defendant wishes "to replace" their attorney of record with another attorney. When the judge said, "What you want to do is represent yourself," defendant responded, "Yes."

The judge then told defendant that *Marsden* and *Faretta* hearings "are kind of different things," and asked, "Is it your desire to replace your attorney with another attorney or do you wish to be your own attorney?" Defendant answered, "I—like I said, I would rather just represent myself." The judge told defendant there was no need to conduct a *Marsden* hearing because there was no need to assess whether defendant's appointed attorney should be replaced by another appointed attorney.

22

Defendant responded, "Okay." The judge then told defendant, "It sounds to me like you made this decision today. Would you be prepared to be your own attorney in preparing the necessary motions in anticipation of sentencing?" Defendant answered, "Yes."

The trial judge then engaged defendant in the following colloquy:

"THE COURT: Let's see. So you understand your right to an attorney completely; correct?

"THE DEFENDANT: Yes.

"THE COURT: And you are wishing to give up this right?

"THE DEFENDANT: Yes.

"THE COURT: Do you understand you made some representation to me just now that you have some ignorance of the law, which is understandable. You didn't go to law school. But that you feel comfortable and you could learn?

"THE DEFENDANT: Yes.

"THE COURT: You understand you will be on your own. I won't appoint for you what's called 'co-counsel' to help represent you. [¶] You understand that?

"THE DEFENDANT: Okay.

"THE COURT: All right. You won't be entitled to any special privileges. In other words, when we do our motions, which probably won't be today from what I'm hearing from you, you need some preparation time.

"THE DEFENDANT: Yes.

"THE COURT: But you won't be entitled to any special privileges. I'm going to treat you just like an attorney. I'm going to accord you the same respect and I'm going to

23

presume you understand the law just like any attorney who appears before me. And I can't give you any special breaks or I can't advise you on the law. [¶] You understand that?

"THE DEFENDANT: Okay."

The trial judge asked defendant if he understood he would be representing himself against an experienced prosecutor with years of experience, and defendant responded, "Yes." The judge then explained to defendant that, because he was in custody during the trial, he would receive no greater privileges in the jail library than any other inmate, and that the court had no control over the hours the defendant would be permitted to use the jail library. When asked if he understood, defendant answered, "Yes." The judge also explained to defendant that he would not be able to claim ineffective assistance of counsel on appeal for purposes of posttrial motions and sentencing during which defendant represented himself. Defendant told the judge that he understood. The judge explained to defendant that his self-representation was contingent on his behaving in court, and that he could be excluded from the proceedings or have his self-represented status revoked if he acted out of control or disrupted the proceedings. Again, defendant told the judge he understood.

The judge then addressed the probation report, which recommended a sentence of nine years eight months, and gave defendant a moment to review the report. When asked if he had considered possible defenses regarding sentencing, defendant said, "Yeah. I'm doing that 'cuz, your Honor, I'm baffled at what went on in this whole trial your Honor. I am not understanding—I tried to let my attorney—." The trial judge stopped defendant

24

mid-sentence, telling him not to talk about his attorney. Defendant again explained his belief that the prosecution's theory of the case was wrong because Javier was not the victim, and that he would be moving for a new trial.

The judge then asked defendant a series of questions about his ability to understand what had been said and his competency to represent himself:

"THE COURT: Tell me how many years of formal education you've had starting—you have finished elementary school?

"THE DEFENDANT: Yes.

"THE COURT: Middle school?

"THE DEFENDANT: Yes.

"THE COURT: And how many years of high school?

"THE DEFENDANT: Up to the 10th grade.

"THE COURT: English is your first language?

"THE DEFENDANT: Yes.

"THE COURT: Have you been treated for any emotional or mental illness?

"THE DEFENDANT: No.

"THE COURT: Are you currently on any medications or drugs or anything?

"THE DEFENDANT: No.

"THE COURT: Have you had any difficulty understanding any of my questions?

"THE DEFENDANT: No."

The trial judge then asked defendant to confirm that he wished to represent himself for purposes of moving for a new trial. Defendant replied, "Yes. My due

25

process, everything was violated, I feel. I mean, I don't know who else to turn to, your Honor." Defendant told the judge that his appointed attorney ignored his assertion that Javier was not the victim, and that originally he "was going to ask you for a bench trial." He then told the judge, "So I don't know what else to do. I'm—I don't know. I'm stuck. I'm stuck between a rock and a hard place, your Honor." The judge again asked defendant a series of questions to ascertain whether defendant wished to represent himself:

"THE COURT: Okay. One thing I need to get perfectly clear, because you said you don't know what else to do. I want to be clear that you want to represent yourself—

"THE DEFENDANT: Yes.

"THE COURT: —rather than have another attorney help you?

"THE DEFENDANT: Yes.

"THE COURT: Because I don't know what to do—

"THE DEFENDANT: Would that be co-counsel?

"THE COURT: I'm sorry?

"THE DEFENDANT: Would that be co-counsel?

"THE COURT: Remember, I told you, you don't get co-counsel. Either you have an attorney represent you or you represent yourself. But I want to make sure you understand you do have that choice. And you are choosing to represent yourself.

"THE DEFENDANT: I represent myself, yes."

Based on defendant's responses, the judge stated on the record she was satisfied that defendant wanted to represent himself. The court therefore relieved the public defender, and defendant was given propria persona status.

2.     Applicable Law.

"The United States Supreme Court has construed the federal Constitution's Sixth Amendment, which guarantees 'the assistance of counsel' to an accused in a criminal prosecution, to also guarantee a right of self-representation." (*People v. Elliot* (2012) 53 Cal.4th 535, 592, citing *Faretta*, *supra*, 422 U.S. at p. 834.) "'A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers.' [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 252-253.)

"'The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied.' [Citation.] Moreover, the *Faretta* right is forfeited unless the defendant '"articulately and unmistakably"' demands to proceed in propria persona. [Citations.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 98-99 (*Valdez*).)

27

"'A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation]." [Citation.] "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation." [Citation.] Rather, "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citation.]' [Citation.] Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.]" (*People v. Burgener* (2009) 46 Cal.4th 231, 241 (*Burgener*).)

"On appeal, we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 (*Koontz*).)

3.    The Trial Court Was Not Required to Conduct a *Marsden* Hearing, and the Record Demonstrates Defendant Unequivocally Desired to Represent Himself.

Defendant contends the trial court erred by not conducting a *Marsden* hearing to determine whether he unequivocally waived his right to representation. According to defendant, his request to represent himself was equivocal because he continued to address what he believed to be the flaws in his appointed attorney's defense, and that the court erred by not inquiring further whether defendant's appointed counsel rendered ineffective assistance of counsel. We are not persuaded.

28

"When a defendant seeks to obtain a new court-appointed counsel on the basis of inadequate representation, the court must permit him or her to explain the basis of her contention and to relate specific instances of inadequate performance. The court must appoint a new attorney if the record clearly shows the current attorney is not providing adequate representation or that the defendant and counsel have such an irreconcilable conflict that ineffective representation is likely to result. [Citations.]" (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623.)

When the defendant does not seek new counsel, however, and the record demonstrates he wishes unequivocally to represent himself, the trial court is not required to conduct a *Marsden* hearing. (*People v. Gallego* (1990) 52 Cal.3d 115, 161-162; *People v. Gonzalez* (2012) 210 Cal.App.4th 724, 741.) A defendant's "expressions of dissatisfaction with his attorney as a reason for [his] decision [to waive his right to counsel and to represent himself] are insufficient to require the court to inquire whether he wanted substitute counsel." (*People v. Frierson* (1991) 53 Cal.3d 730, 741, citing *People v. Burton* (1989) 48 Cal.3d 843, 855 (*Burton*).) Our Supreme Court has expressly rejected "the rule that whenever a defendant makes a motion to represent himself on the basis of dissatisfaction with counsel, the court automatically should inquire [under *Marsden*] whether he would like to make a motion for substitution of counsel. [Citations.]" (*Burton,* at p. 855.) "[T]he two motions are fundamentally different, one raising the question of defendant's competency to waive his right to counsel and the other raising the question of existing counsel's competency." (*Ibid.*)

Here, nothing in the record supports the conclusion that defendant wished the court to appoint a new attorney to represent him. Instead, the record demonstrates an unequivocal desire by defendant to waive his right to counsel and to represent himself.

Defendant filed a *Faretta* form, which stated he wished to waive his right to counsel and to represent himself. When the trial judge asked defendant if he understood it was "almost always unwise to represent yourself," defendant answered, "Yes." When defendant tried to tell the judge why he thought his appointed counsel did not present an adequate defense, the trial judge told defendant he could air his concerns in a closed hearing but that the court's immediate concern was finding out if defendant wanted to represent himself and if he was prepared to do so. Defendant told the judge that he did wish to represent himself, but said he wanted a *Marsden* hearing to explain why he no longer wanted his appointed attorney. The judge told defendant that a *Marsden* hearing is conducted only when the defendant wishes to replace his attorney with a new attorney and that defendant was requesting to represent himself. Defendant told the judge, "like I said, I would rather just represent myself."

When asked specifically if defendant understood his right to an attorney and if he wished to waive that right, defendant responded, "Yes." When defendant again started to tell the judge why he felt his attorney did not present an adequate defense, the judge once more asked defendant if he wished to represent himself and did not wish the court to appoint a new attorney to represent him. Defendant responded, "I represent myself, yes."

On the record, we conclude defendant ""'"articulately and unmistakably"'"" requested to represent himself.[9] (*Valdez*, *supra*, 32 Cal.4th at p. 99.)  At no time did defendant say he wanted the court to appoint another attorney to represent him, and his expressions of displeasure with his attorney did not suggest that he wanted a new one. The trial court was not required to conduct a *Marsden* hearing simply because defendant wanted to air his grievance with appointed counsel.

4.      The Trial Court Adequately Advised Defendant of the Pitfalls and Consequences of Self-Representation.

Defendant argues the *Faretta* advisements in this case "fell short" of those recommended by this court in *People v. Lopez* (1977) 71 Cal.App.3d 568 (*Lopez*) (Fourth Dist., Div. Two).  We disagree.

As our Supreme Court explained in *Koontz*, *supra*, 27 Cal.4th at pp. 1070-1071, in *Lopez* this court "enumerated a set of suggested advisements and inquiries designed to ensure a clear record of a defendant's knowing and voluntary waiver of counsel.  First,

_____

[9] As an additional basis for finding his request for self-representation was equivocal, defendant points to the fact that he "did not have the benefit of glasses to see paperwork to assist himself."  Before the *Faretta* hearing, defendant's daughter informed the court that she tried unsuccessfully to deliver new glasses to defendant in jail.  The court ordered jail officials "to accept the eye glasses . . . so long as the eye glasses comply will all facility guidelines."  When discussing the probation department's sentencing recommendation—*after* the trial court had already conducted the *Faretta* hearing and relieved the public defender—defendant told the court he had not received his new glasses and that he was legally blind.  Defendant did not say he could not read the *Faretta* form he signed and initialed and, in any event, the oral proceedings demonstrate defendant unequivocally wished to represent himself and did not want new counsel.

the court recommended the defendant be cautioned (a) that self-representation is 'almost always unwise,' and the defendant may conduct a defense "'ultimately to his own detriment'" ([*Lopez, supra*, 71 Cal.App.3d] at p. 572); (b) that the defendant will receive no special indulgence by the court and is required to follow all the technical rules of substantive law, criminal procedure and evidence in making motions and objections, presenting evidence and argument, and conducting voir dire; (c) that the prosecution will be represented by a trained professional who will give the defendant no quarter on account of his lack of skill and experience; and (d) that the defendant will receive no more library privileges than those available to any other self-represented defendant, or any additional time to prepare. Second, the *Lopez* court recommended that trial judges inquire into the defendant's education and familiarity with legal procedures, suggesting a psychiatric examination in questionable cases. The *Lopez* court further suggested probing the defendant's understanding of the alternative to self-representation, i.e., the right to counsel, including court-appointed counsel at no cost to the defendant, and exploring the nature of the proceedings, potential defenses and potential punishments. The *Lopez* court advised warning the defendant that, in the event of misbehavior or disruption, his or her self-representation may be terminated. Finally, the court noted, the defendant should be made aware that in spite of his or her best (or worst) efforts, the defendant cannot afterwards claim inadequacy of representation. (*Id*. at pp. 572-574.)"

The Supreme Court stressed that "the purpose of the suggested *Lopez* admonitions is to ensure a clear record of a knowing and voluntary waiver of counsel, not to create a threshold of competency to waive counsel. [Citations.]" (*Koontz, supra*, 27 Cal.4th at

32

p. 1071; see *People v. Miranda* (2015) 236 Cal.App.4th 978, 986, fn. 3 [*Lopez* "merely suggested areas of inquiry by the trial court when considering a *Faretta* motion"]; *People v. Mellor* (1984) 161 Cal.App.3d 32, 37 [Fourth Dist., Div. Two] ["*Lopez* does *not* require any particular inquiries or pronouncements by the trial court"].)  In any event, the trial court's advisements here closely track those we suggested in *Lopez*.

The trial judge explained, "it is almost always unwise to represent yourself" and that defendant might end up helping the prosecutor.  The judge told defendant that, although he was ignorant of the law, defendant would not be afforded "special privileges"; he would be treated with the same respect as a licensed attorney; he would get no "special breaks"; and the court would not advise defendant on the law.  The judge also told defendant he would be "going against the prosecutor . . . who has had several years of experience," and that "it will likely not be a fair contest."  With respect to access to the jail law library, the trial judge told defendant he would "receive no greater library privileges than any other pro per," and that jail officials, and not the court, had control over the hours he would be permitted to use the law library.

The trial judge asked defendant about the extent of his formal education; asked if defendant had ever been treated for emotional or mental illness; and asked if defendant was under the influence of any medications or drugs during the hearing.  The trial judge explained to defendant that he had a choice whether to represent himself or be represented by an attorney, and asked if defendant wished to waive his right to counsel.  The trial judge also explained to defendant that the probation department recommended a sentence of nine years eight months in state prison, and asked if defendant had any

33

defenses he wished to present at sentencing. Defendant told the judge he would be moving for a new trial based on his assertion that Javier was not the victim. The judge also explained that, if defendant acted out of control or disrupted the proceedings, the court could exclude him or revoke his propria persona status. The trial judge told defendant that he could not claim ineffective assistance of counsel on appeal "based on the quality of your representation as it exists today forward." Finally, although not part of this court's suggested admonitions in *Lopez*, the trial judge told defendant he would not be afforded the assistance of co-counsel.

Notwithstanding that the trial judge's admonitions comport almost to the letter of *Lopez,* defendant argues "the record reflects no meaningful dialogue between the court and [defendant] regarding his maximum exposure, his rights and responsibilities of representing himself at sentencing, or the assistance which could have been provided him had he been represented by counsel to seek reduction in that term through the presentation of evidence or arguments regarding striking certain priors in the interests of justice, pursuant to section 1385, or staying certain terms, pursuant to section 654, or a request for concurrent terms."

In *Burgener*, *supra*, 46 Cal.4th 231, a capital defendant moved to be relieved of counsel for purposes of sentencing and renewing a motion under section 190.4, subdivision (e), to modify the verdict from death to life in prison without the possibility of parole. (*Id*. at pp. 234, 237, 242.) The Supreme Court stated "the scope of a proper advisement of the right to counsel depends on the particular facts and circumstances of the case as well as the stage of the proceedings." (*Id*. at p. 242, citing *Iowa v. Tovar*

34

(2004) 541 U.S. 77, 88.) The court also stated that a proceeding to modify a death verdict "differs markedly from a trial on the merits, which involves voir dire of potential jurors, the examination and cross-examination of witnesses, and jury instructions. [Citation.]" (*Burgener*, at p. 242.) Finally, the court noted a motion to modify a death verdict "is based only on evidence that has already been presented to the jury [citation], and the application in this case had already been briefed." (*Burgener*, at p. 242.) Therefore, the court concluded those circumstances warranted "a less searching or formal colloquy in response to defendant's request to represent himself." (*Ibid.*)

Although not binding on this court (*People v. Linton* (2013) 56 Cal.4th 1146, 1182, fn. 8), decisions of the lower federal courts have also held that a trial court's inquiry need not be as exhaustive when the defendant wishes to represent him or herself at sentencing. "In *Patterson v. Illinois* (1988) 487 U.S. 285, 298, the Supreme Court adopted a 'pragmatic approach' to the issue of Sixth Amendment waiver of counsel, 'asking what purposes a lawyer can serve at the particular stage of the proceedings.' Sentencing hearings demand much less specialized knowledge than trials; for instance, the Federal Rules of Evidence do not apply in sentencing hearings. [Citation.]" (*United States v. Day* (8th Cir. 1993) 998 F.2d 622, 626; see *United States v. Marks* (8th Cir. 1994) 38 F.3d 1009, 1015.) While acknowledging that "sentencing is a critical and often times complicated part of the criminal process that contains subtleties which may be beyond the appreciation of the average layperson" (*United States v. Salemo* (3d Cir. 1995) 61 F.3d 214, 219, 220 (*Salemo*), superseded by rule as stated in *United States v. Turner* (3rd Cir. 2012) 677 F.3d 570, 578), the Third Circuit has concluded that

35

*Faretta* warnings given before sentencing "need not be as exhaustive and searching as similar inquiry before the conclusion of trial."  (*Salemo*, at p. 219.)

Defendant cites no authority for the proposition that a trial judge conducting a *Faretta* hearing before sentencing must advise the defendant that, by waiving his right to counsel, he will be foregoing the benefits of counsel in seeking a reduced sentence.  The trial judge need not tell the defendant that he may present mitigating evidence; that he may move to strike priors; that he may argue that the sentence on some counts must be stayed pursuant to section 654; that he may request concurrent instead of consecutive sentences; and that by waiving his right to counsel, his ability to successfully do any of these things will be greatly reduced.

The trial court adequately told defendant the sentence he faced, and that by waiving his right to counsel he would be going up against an experienced prosecutor without any of the benefits of being represented by counsel.  On this record, we conclude defendant waived his right to counsel with his eyes open (*Burgener*, *supra*, 46 Cal.4th at p. 241), and that the trial court properly granted his *Faretta* request.

D.      *The Trial Court Properly Sentenced Defendant on Count 3 and Did Not Abuse Its Discretion by Declining to Strike Prior Prison Term Enhancements*

Defendant argues the sentence on count 3 had to be stayed pursuant to section 654 or, in the alternative, the sentence should have run concurrently with the sentence on count 2 instead of consecutively, because he allegedly possessed the slungshot and committed the assault with a deadly weapon during the same indivisible course of conduct.  He also argues the trial court did not appear to understand its discretion to strike

36

prior prison term enhancements, and we must remand the case for the court to exercise that discretion. We find no sentencing error.

1. Imposition of the Sentence on Count 3 Did Not Violate Section 654.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "It is well settled that section 654 protects against multiple punishment, not multiple conviction. [Citation.] The statute itself literally applies only where such punishment arises out of multiple statutory violations produced by the 'same act or omission.' [Citation.] However, because the statute is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

"'"'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" [Citation.]" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885.) "'It is [the] defendant's intent and objective, not temporal proximity of his offenses, which determine whether the transaction is indivisible.' [Citation.] '"The defendant's intent and objectives are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the]

37

finding the defendant formed a separate intent and objective for each offense for which he was sentenced."'  [Citation.]"  (*Id.* at p. 886, fn. omitted.)  ""'"A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence.'  [Citation.]"  [Citations.]'"  (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

Relying primarily on *People v. Bradford* (1976) 17 Cal.3d 8 and this court's opinion in *People v. Ratcliff* (1990) 223 Cal.App.3d 1401 (Fourth Dist., Div. Two), defendant contends his possession of a slungshot was indivisible with the assault with a deadly weapon and, therefore, punishment on the possession conviction must be stayed pursuant to section 654.  We disagree.

The Court of Appeal in *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565, set forth the principles applicable in this case:  "In cases involving firearms and multiple punishment issues, a section 654, subdivision (a) violation has been held to occur in an unusual factual scenario.  Section 654, subdivision (a) has been held to apply when fortuitous circumstances place the firearm in the accused's hands only at the instant of the commission of another offense.  (*People v. Bradford* (1976) 17 Cal.3d 8, 21-23; *People v. Venegas* (1970) 10 Cal.App.3d 814, 818-821.)  For example, in *Bradford*, after robbing a bank and driving away in a car, a state traffic officer stopped the defendant for speeding. The defendant then struggled with the officer.  The defendant got control of the gun during the struggle and fired shots at the officer.  In concluding section 654 barred multiple sentencing for the assault and weapons possession, our Supreme Court

38

explained, 'Defendant's possession of [the officer's] revolver was not "antecedent and separate" from his use of the revolver in assaulting the officer.' (*People v. Bradford*, *supra*, 17 Cal.3d at p. 22; see *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1411-1412.)  In *Venegas*, the victim pulled a gun and a struggle ensued with the defendant. During the struggle, the defendant shot the victim. (*People v. Venegas*, *supra*, 10 Cal.App.3d at pp. 818-821.)  The Court of Appeal held:  'Here the evidence shows a possession only at the time defendant shot [the victim].  Not only was the possession physically simultaneous, but the possession was incidental to only one objective, namely to shoot [the victim].'  (*Id*. at p. 821; see *People v. Ratcliff*, *supra*, 223 Cal.App.3d at p. 1412.)  Our colleagues in Division Two of the Fourth Appellate District synthesized the holdings in *Bradford* and *Venegas* thusly, 'From *Bradford* and *Venegas*, we distill the principle that if the evidence demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the possession of the weapon by an ex-felon.' (*People v. Ratcliff*, *supra*, 223 Cal.App.3d at p. 1412; see *People v. Jones* (2002) 103 Cal.App.4th 1139, 1145.)"  (*People v. Garcia*, *supra*, 167 Cal.App.4th at p. 1565.)

The record does not support defendant's assertion that his possession of the slungshot was merely "incidental" to the assault with a deadly weapon.  Although nobody testified they saw defendant possess the slungshot before the argument started, both Ernest and Javier testified they saw the slungshot in defendant's hand when they entered the room.  Moreover, defense counsel elicited testimony that defendant may have used the object in his tree-trimming business.  The most logical inference to be drawn from the

39

evidence is that defendant possessed the slungshot before he started arguing with Javier and assaulted him, such that his motive and intent for the possession and for the assault with a deadly weapon were not the same. Therefore, section 654 does not prohibit separate punishment for the unlawful possession.[10] (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1218; *People v. Jones*, *supra*, 103 Cal.App.4th at p. 1145.)

2. The Record Indicates the Trial Court Understood Its Discretion to Strike Prior Prison Term Enhancements.

Finally, defendant argues the record does not demonstrate the trial court understood its discretion under section 1385, subdivision (a), and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, to strike the enhancement for one or more of his admitted prior prison terms, so we must remand the matter for the court to exercise that discretion. We disagree.

"The enhancement language in section 667.5 is mandatory unless the additional term is stricken," and "a section 667.5, subdivision (b) prior prison term enhancement may be stricken pursuant to section 1385, subdivision (a). [Citations.]" (*People v. Garcia*, *supra*, 167 Cal.App.4th at p. 1561.) "[A] court's failure to dismiss or strike a

---

**10** Defendant's alternative argument—that the trial court erred by not imposing a concurrent sentence on count 3 pursuant to California Rules of Court, rule 4.425—is based entirely on the premise "that the acts underlying each of the convictions stemmed from an indivisible course of conduct." Because we conclude the acts are divisible for purposes of section 654, *ante*, we conclude the trial court correctly imposed a consecutive sentence on count 3. (Cal. Rules of Court, rule 4.425(a)(1).)

40

prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)

"'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) When the record demonstrates the trial judge was unaware of or misunderstood her sentencing discretion, the Supreme Court has held that "the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*Ibid*.)

As an initial matter, defendant concedes he did not move to strike the punishment for any of his six admitted prior prison terms, and he did not object when the trial court imposed a sentence enhancement for all six. "[A]ny failure on the part of a defendant to invite the court to dismiss under section 1385 following *Romero* waives or forfeits his or her right to raise the issue on appeal." (*Carmony*, *supra*, 33 Cal.4th at pp. 375-376, citing *People v. Scott* (1994) 9 Cal.4th 331, 352-353.)

Even if defendant did not forfeit this claim of error, it is based on a misreading of the record. In the first amended information, the People alleged defendant committed counts 2 and 3 while out on bail (§ 12022.1, subd. (b)), and that defendant suffered nine prior prison terms (§ 667.5, subd. (b)). After the jury rendered its verdicts, defendant

41

admitted to suffering six prior prison terms. After accepting defendant's admissions, the trial judge asked the prosecutor, "Are you going to strike the prison priors now or at sentencing?" The prosecutor responded she would move to strike them at sentencing. At the close of the sentencing hearing, the prosecutor moved "to strike any remaining allegations." The trial court granted the motion, and struck the two out-on-bail allegations and the three remaining prior prison term allegations. From the foregoing, it is clear the trial court understood it had discretion to strike prior prison term allegations. That the court did not state on the record why it declined to exercise its discretion to strike *additional* priors is of no moment. "While a court must explain its reasons for striking a prior (§ 1385, subd. (a); [citation]), no similar requirement applies when a court declines to strike a prior [citation]." (*In re Large* (2007) 41 Cal.4th 538, 550.)

Finally, a remand would serve no purpose because, on this record, we conclude the trial court would not have stricken the enhancement for defendant's admitted prior prison terms even if defendant had so requested. During argument on defendant's motion for new trial, the prosecutor explained the People acted in the interests of justice by not alleging defendant suffered a conviction for a strike prior (see §§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), and instead concluded "all of the six prison priors and the charges were sufficient." As already noted, at sentencing, the People moved to dismiss the three prior prison term enhancement allegations and the two out-on-bail enhancement allegations that defendant did not admit, and the trial court struck them. In light of defendant's extensive felony record going back to 1980, and the potential for serious

bodily harm or death in this case, we cannot say that failure to strike the enhancement for one or more of defendant's prior prison terms was an abuse of discretion.

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

KING
J.

MILLER
J.